**\*E-Filed 11/16/11\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

TIMOTHY SCOTT CAMPBELL, KERIE CAMPBELL, MARCUS KRYSHKA, MARC MCKINNIE, MICHAEL SIEGEL, *and* AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA,

Plaintiffs,

v.

CITY OF OAKLAND, INTERIM CHIEF OF POLICE HOWARD JORDAN, *and* DEFENDANT DOES 1-100,

Defendants.
_____/

No. C 11-5498 RS

**ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER**

## I. INTRODUCTION

On November 14, 2011, plaintiffs filed this civil rights action against the City of Oakland and Interim Chief of Police Howard Jordan (collectively "Oakland") based on confrontations between local law enforcement officers and individuals observing and taking part in the "Occupy Oakland" protests. Plaintiffs simultaneously filed an *ex parte* request for a temporary restraining order (TRO) enjoining defendants' alleged indiscriminate and excessive use of force, which plaintiffs contend violates the Oakland Police Department's own Crowd Control and Crowd Management Policy. In response, on the same day, the court issued an order requiring plaintiffs to serve their request, the supporting papers, and the order itself, on the defendants by the close of

1  business. Per the order's further instruction, defendants filed a written response to plaintiffs'
2  request by the close of business the next day. Upon consideration of the briefs, and for the reasons
3  stated below, plaintiffs' application for a TRO is denied.

## II. FACTS

This case arises out of the Occupy Oakland protest. The protest began in early October 2011, one of many nationwide demonstrations inspired by New York's "Occupy Wall Street" movement. The protesters seek to raise awareness about economic inequality, and advocate political and social change. They have repeatedly convened on Frank Ogawa Plaza, in front of Oakland City Hall, with some erecting tents and others periodically gathering there for meetings and rallies. Most of these events, all acknowledge, have transpired without incident. Oakland emphasizes, further, that it has made efforts to accommodate the protests by diverting traffic during marches, and like events.

On October 20, 2011, however, Oakland presented protestors at the plaza with an eviction notice, and in the early morning hours of October 25, Oakland police and municipal employees, assisted by law enforcement officers from other local agencies, forcibly removed demonstrators from the plaza. Here, the parties' accounts of the facts diverge. By plaintiffs' account, the police action was not adequately announced to protesters, and officers endangered the crowds by indiscriminately and prematurely deploying aggressive dispersal techniques. According to Oakland, the operation was conducted in "strict accordance" with the Crowd Control Policy: announcements were made, and protestors had an opportunity to leave before approximately 70 people were arrested.

Oakland's Crowd Control and Crowd Management Policy is generally designed to "uphold constitutional rights of free speech and assembly while relying on the minimum use of force and authority needed to address a crowd management or crowd control issue." Ex. 1 (Crowd Control Policy) to Jordan Decl. in Supp. of Defs.' Opp. Br., at 1. It specifies crowd control techniques and dispersal tactics that may be appropriately used in certain circumstances. For instance, when an assembly is declared unlawful, "[t]he police may not disperse a demonstration or crowd event

2

before demonstrators have acted illegally or before the demonstrators pose a clear and present danger of imminent violence." *Id.* at 11. The policy also places limits on the use of chemical agents, "flash bang" grenades, and "less lethal" munitions, for example, by requiring that demonstrators receive warnings, and an opportunity to disperse, prior to the deployment of such devices.

Oakland claims it continued to facilitate the protests throughout the day by diverting traffic and allowing protestors to occupy downtown areas until the afternoon, when some portion of the crowd began to threaten and assault police officers. According to plaintiffs, the police fired flash bang grenades and tear gas into crowds on several occasions. In the evening, the protests once again convened at Frank Ogawa Plaza and another confrontation ensued. Plaintiffs state that the police ordered dispersal before any illegal conduct had occurred, or proceeded to disperse the crowd without making the requisite announcements, in violation of the Crowd Control Policy. Plaintiffs have also filed numerous declarations describing police officers' use of projectiles, including flash bang grenades, tear gas, rubber bullets, and pepperballs, on crowds or non-threatening individuals, including the named plaintiffs. According to plaintiffs, protestors sustained serious injuries as a result. Oakland, by contrast, denies knowledge of injuries and insists that it deployed force to protect police and city sanitation crews in the plaza from hostile protestors. According to the Interim Chief of Police, Oakland police declared an unlawful assembly around the plaza, and made the appropriate announcements, thereby permitting protestors to leave voluntarily, before responding to individuals throwing glass bottles, rocks, and other objects at officers. Again, Oakland avers that its officers' actions strictly complied with the Crowd Control Policy.

Although the protests continued after these events, it appears there were no further incidents until November 2, 2011. On that day, demonstrators called for a general strike and disrupted the Port of Oakland's operations. The parties agree that the majority of the events that occurred throughout the day "were peaceful and involved no police confrontation." Pls.' Mem. in Supp. of TRO and Prelim. Inj., at 10:19. Late in the evening, however, another confrontation ensued in the area around the plaza. According to plaintiffs, police again failed to give intelligible dispersal

3

orders, used excessive force, and fired projectiles, flash bang grenades, and tear gas indiscriminately into crowds and toward non-threatening individuals, including the named plaintiffs. Approximately eighty demonstrators were arrested. The Interim Chief of Police states that police acted "surgically," with tear gas and less lethal munitions, in response to violent protesters who were assaulting police with bottles and concrete blocks. The response, he further emphasizes, avoided disrupting peaceful demonstrators who had by then returned to Frank Ogawa Plaza. Again, Oakland insists that its officers acted in compliance with the Crowd Control Policy, although it acknowledges that the confrontations on both October 25 and November 2 were "tense, violent, and chaotic." Defs.' Opp. Br., at 4:22.

Plaintiffs aver that the *en masse* protests continue, and that further violent confrontations between demonstrators and police are imminent. The named plaintiffs state in their declarations that they wish to continue to participate in the Occupy Oakland protests, but hesitate to do so out of fear for their safety. The Interim Chief of Police indicates that he intends to investigate allegations of injuries or police misconduct, but states that in recent days there have not been any violent confrontations, despite nearly daily interactions between the Occupy protesters and police. The defendants also emphasize that they intend to continue complying with the Crowd Control Policy and the law.

### III. LEGAL STANDARD

A TRO may be granted upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The purpose of such an order, as a form of preliminary injunctive relief, is to preserve the status quo and prevent irreparable harm "just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974). A request for a TRO is evaluated by the same factors that generally apply to a preliminary injunction, *see Stuhlbarg Int'l. Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001), and as a form of preliminary injunctive relief, a TRO is an "extraordinary remedy" that is "never granted as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

4

1   Rather, the moving party bears the burden of demonstrating that "he is likely to succeed on the
2   merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the
3   balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555
4   U.S. at 20. Alternatively, if the moving party can demonstrate the requisite likelihood of irreparable
5   harm, and show that an injunction is in the public interest, a preliminary injunction may issue so
6   long as there are serious questions going to the merits and the balance of hardships tips sharply in
7   the moving party's favor. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.
8   2011).

## IV. DISCUSSION

A TRO is an "extraordinary remedy," and plaintiffs' proposed order is indeed exceptional. Specifically, they ask that the court order Oakland to stop violating its own Crowd Control Policy. Such an order would effectively require the court to supervise and oversee defendants' compliance with that policy pending a further hearing on a preliminary injunction. Even accepting everything plaintiffs allege as true, for the reasons explained below, plaintiffs cannot, on the current record, carry their burden to satisfy each of the four factors required for such an expansive and unfettered order.

### A. Likelihood of success

To prevail, plaintiffs must first show that they likely will succeed on the merits of their constitutional claims.[1] *Winter*, 555 U.S. at 20. It is not enough to show that there is a "possibility" of success. *Id.* at 22 (reversing Ninth Circuit's "possibility" standard). Rather, there must be a "clear showing" that the plaintiffs are entitled to preliminary relief. *Id.* Without fully adjudicating plaintiffs' claims on the merits, it is apparent that they cannot satisfy this requirement on the existing record. Although plaintiffs have produced a significant body of evidence that establishes

---

[1] Plaintiffs also predicate their request for a TRO on the theory that they are third-party beneficiaries of a settlement agreement that resolved two prior consolidated cases, and compelled Oakland to adopt its current Crowd Control Policy. *See Local 10, Int'l Longshore and Warehouse Union v. City*, No. C 03-2961 TEH, *and Coles v. City of Oakland*, No. C 03-2961 TEH. Plaintiffs have not met their burden to show a likelihood of success, or even a serious question, as to the viability of that claim.

5

1 some probability of success on their individual claims for relief for past violations of 42 U.S.C. § 1983, and their allegations that defendants violated the Crowd Control Policy on sporadic occasions, ultimate success on these claims would entitle plaintiffs to money damages only, *not* injunctive relief.

To justify an order generally requiring Oakland to comply with its Crowd Control Policy, plaintiffs must show that such "systemwide relief" is necessary to prevent defendants from concertedly violating the protesters' constitutional rights. *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Sporadic or isolated violations of individual protesters' rights are insufficient to support broad injunctive relief against an entire agency. *Id.* Although plaintiffs have attempted to couch their allegations in systemic terms, in doing so they ignore the undisputed fact that the Occupy Oakland protests have continued, at times, for days on end without any alleged unconstitutional interference from local authorities. By plaintiffs' account, actionable conduct has occurred on no more than two to three occasions, spanning a number of hours, in over a month of almost continual demonstrations taking place across Oakland. Thus, plaintiffs' request must fail on its own terms.

Of course, the facts of these incidents are highly disputed and, as discussed in greater detail below, the court cannot simply ignore defendants' version of events. *City of Los Angeles v. Lyons*, 461 U.S. 95, 112-13 (1982). Rather, the law obligates consideration of "the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken v. Bradley*, 433 U.S. 267, 280 (1977). Defendants insist that the police acted in accordance with the Crowd Control Policy and their constitutional duties, and that any departures will be subject to internal investigations as well as potential civil liability. They also characterize any alleged deviations as the exception, rather than the rule. As a result, at this very early stage, plaintiffs have not carried their heavy burden by clearly showing likely success on their claims that defendants' alleged ongoing constitutional violations are so widespread, and systematic in nature, as to warrant the extraordinarily broad relief requested.

B.  Immediate, irreparable harm

Plaintiffs' request also fails because they have not sufficiently shown a likelihood of immediate, irreparable harm. Plaintiffs aver that the First and Fourth Amendment injuries allegedly suffered by protesters at the hands of defendants are irreparable as a matter of law. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"), *and Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same as to Fourth Amendment freedoms). There can be no question that the injuries, as alleged, are serious. However, in cases such as this one, the Supreme Court has recognized that "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury *which is both great and immediate.*" *Lyons*, 461 U.S. at 112 (emphasis added). More generally, whenever a court is asked to exercise its equitable powers to oversee state law enforcement authorities, it must be especially mindful of "[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Id.*, *citing Stefanelli v. Minard*, 342 U.S. 117, 120 (1951).

Here, plaintiffs argue that the Occupy Oakland protests are ongoing, and that "Court relief is necessary to prevent irreparable harm to constitutional rights to be free from excessive force and to protest without fear of excessive force." Pls.' *Ex Parte* Appl. for TRO, at 1:11-13. However, as noted above, plaintiffs' own evidence demonstrates that the great majority of the interactions between police and Occupy Oakland protestors have been peaceful. Thus, to arrive at the conclusion that irreparable injury is imminent, plaintiffs must assume that confrontations between police and protestors will escalate in the future, and that Oakland will persist in allegedly violating its own policies and the law. Because the Occupy Oakland protests have continued for over a month with relatively limited confrontations, plaintiffs' own averments fall short of establishing a likelihood of immediate, irreparable harm.

This conclusion finds further support in the special prudential considerations identified by the Supreme Court in *Lyons* and its progeny. The defendants aver that they intend to comply with the Crowd Control Policy and the Constitution in the future. To issue an order requiring them to do

7

so would potentially run afoul of the Court's cautionary instructions not to upset the delicate structure of our federalist system without adequate justification. As the defendants point out: "Crowd control and dispersal actions following the declaration of an unlawful assembly is dangerous and difficult work." Defs.' Opp. Br., at 4:26-27. The facts in this case, even as alleged by plaintiffs, simply do not resemble the circumstances in the civil rights-era protest cases that plaintiffs invoke to justify the issuance of injunctive relief against local authorities. *See Houser v. Hill*, 278 F.Supp. 920, 926 (D. Ala. 1968), *Cottonreader v. Johnson*, 252 F.Supp. 492, 496-97 (D. Ala. 1966), *and Schnell v. City of Chicago*, 407 F.2d 1084, 1085 (7th Cir. 1969) (overruled on other grounds). Where, as here, the factual record is incomplete and defendants have not yet had an adequate opportunity to respond, caution favors holding a hearing before intruding into local law enforcement operations.

### C. Balance of the equities & public interest

Finally, it remains unclear whether the balance of the equities, and the public interest, favor plaintiffs or defendants. Both parties maintain compelling interests. Plaintiffs, of course, seek to protect and exercise their First and Fourth Amendment rights in ways that implicate the public interest. The defendants, on the other hand, have indisputably accommodated the majority of the demonstrations, and seek to protect the safety and property of other Oakland residents. Accordingly, the final two factors do not weigh in favor of issuing a TRO.

### V. CONCLUSION

For the reasons stated, plaintiffs' motion for a temporary restraining order is denied. The parties are directed to appear at a **preliminary injunction hearing at 1:30 p.m. on November 30, 2011** in Courtroom 3, 17th Floor, 450 Golden Gate Avenue, San Francisco. Plaintiffs may file a supplemental motion for a preliminary injunction by **5 p.m. on Friday, November 18, 2011**. Defendants may file a response by **5 p.m. on Wednesday, November 23, 2011**. Plaintiffs may, if they elect to do so, file a reply brief by **12 p.m. on Tuesday, November 29, 2011**.

IT IS SO ORDERED.

Dated: 11/16/2011

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE